## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| **CHRISTOPHER BOUTON** | **CIVIL DOCKET NO. 6:22-cv-05535** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **MANSON CONSTRUCTION CO.** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

## MEMORANDUM RULING

Before the Court is a MOTION FOR SUMMARY JUDGMENT (the "Motion") [Doc. 37] filed by Defendant Manson Construction Co. (hereinafter, "Manson"). Manson seeks summary judgment with respect to all claims asserted by Plaintiff Christopher Bouton ("Plaintiff" or "Bouton") on grounds the Plaintiff is not a seaman under the Jones Act, 46 U.S.C. § 30104, *et seq.* For the reasons that follow, Manson's Motion is GRANTED.

## FACTUAL BACKGROUND

This lawsuit arises out of a workplace accident that occurred on or around April 10, 2021,[1] on a spudded down or tied off barge located on the St. Johns River in Jacksonville, Florida. At the time of the incident, Plaintiff was an employee of

---

[1] The date of the subject accident is uncertain. In his responses to interrogatories, the Plaintiff indicated that the accident occurred on April 10, 2021; however, the Plaintiff acknowledged in his deposition that he did not report the accident to Manson or seek medical attention on the date the alleged injury occurred and cannot remember the date it happened. (*See* Deposition of Christopher Bouton, attached as Exhibit 2 to Plaintiff's Motion for Summary Judgment, [Doc. 37-2] at pp. 68-69). The Plaintiff testified that Manson "came up with the date." (*Id.* at p. 69).

Although only selected portions of the Plaintiff's deposition were initially filed, Manson produced the entirety of the deposition at the Court's request. A complete copy of the deposition will be filed in the record.

Manson, a marine construction company that specializes, among other things, in the building of wharves, piers, and bridges. (*See* Declaration of Ray Givan,[2] attached as Exhibit 1 to Manson's Motion for Summary Judgment, [Doc. 37-1] at ¶ 3). Manson hired Plaintiff on January 6, 2021, as a carpenter[3] to perform various discrete tasks in connection with the demolition of an existing dock and the construction of a new dock located at the Blount Island Marine Terminal in Jacksonville, Florida (the "BIMT Project"). (*See* Givan Declaration at ¶ 5; *see also* "New Employee Orientation Checklist," attached to Givan Declaration as Exhibit 1-A). Plaintiff was injured when a 70-pound shackle fell on his left foot while he was working on a barge that held the materials pulled from the water in connection with demolition of the existing dock (the "material barge"). (*See* Complaint, Doc. 1 at ¶ 7).

Manson argues that Plaintiff was a general laborer at all relevant times, not a Jones Act seaman. In support thereof, Manson points to a sworn Declaration of Ray Givan, in which Mr. Givan discusses the nature of the BIMT Project and the Plaintiff's work in connection therewith. According to Mr. Givan, the BIMT Project, which was shore-based and related solely to dock demolition and construction, consisted of several distinct phases: (i) Phase I – driving piles and the complete demolition of the wharf while working on the land side of the BIMT dock, which lasted

---

[2]      In his Declaration, Mr. Givan states that he is Manson's General Superintendent for the Gulf of Mexico and East Coast, has been employed by Manson since 2009, and is familiar with Manson's business operations and business records. [Doc. 37-1 at ¶ 1].

[3]      In his deposition, the Plaintiff testified that he was told to "fill in the application as general … laborer, and that's what I did." *See* Deposition of Christopher Bouton, [Doc. 37-3, pp. 29-30].

until approximately March 2021 (Givan Declaration, ¶ 14); (ii)  Phase II – demolition and removal of the piles and other materials that comprised the existing dock on the water side of the BIMT dock, which lasted from approximately March of 2021 to June of 2021 (*Id.* at ¶ 15); and (iii) Phase III – construction of the new dock by driving new piles in place of those that were removed.  The project was completed in March of 2022 (*Id.* at ¶ 7).  According to Mr. Givan, all of Plaintiff's work was located at the BIMT Project site or at an area nearby where Manson was offloading the old dock pilings.  (*Id.* at ¶ 11).

The Plaintiff was employed by Manson only during Phases I and II of the project.  It is undisputed that from his date of hire on January 6, 2021, through March 8, 2021, Plaintiff's work consisted of pouring concrete and other discrete tasks in connection with the removal of the old piles and other materials that comprised the existing dock.  Mr. Givan attests that all of the work performed by Plaintiff during this time period took place on land.  (*Id.* at ¶ 14).  And Bouton acknowledges that when he first started working for Manson, he was working on a pile driving crew on the "land side" of the Project.  (*See* Affidavit of Christopher Bouton, attached as Exhibit B to Plaintiff's Opposition Brief, [Doc. 39-3] at p. 1).

From March 9, 2021, through April 17, 2021, Plaintiff worked on Phase II of the Project.  It is during this Phase that the parties dispute the nature of Plaintiff's work.  According to Manson, Bouton's work during this period consisted almost exclusively of helping remove the piles of the existing dock using a crane working from the "spudded down" crane barge, MB1704.  (Givan Declaration, ¶ 18).  During

this process, the crane operator removed the existing piles from the water and placed them on a separate spudded down "material barge," located immediately next to MB1704.  (*Id.*).   Once the crane operator placed the piles on the material barge, Bouton and other Manson laborers would remove the chain and shackle that connected the pile to the crane's hook and lay the removed pile onto the material barge.  (*Id.* at ¶ 19).   Thus, Plaintiff's primary job responsibilities consisted of unshackling the piles once the crane operator placed them on the material barge.  (*Id.* at ¶ 20).   It is undisputed that both the material barge and the crane barge were either spudded down or tied off when they were being used as work platforms at or near the Blount Island Marine Terminal dock.  (*Id.* at ¶ 17; *see also* Bouton Depo., p. 111).

The record shows that MB1704 and the material barge were located approximately 20-30 feet from the shore, (Bouton Depo., pp. 205-206; Givan Declaration, ¶ 21), and they were situated side-by-side such that the Plaintiff could step back and forth between them.  (Bouton Depo., p. 203).   Plaintiff began each day's work by boarding the MB1704 crane barge by a gangway or a short ride on a tugboat. (*Id.* at pp. 203-209).   While the Plaintiff estimates that his use of a gangway and tugboat was equal ("half and half") (*Id.* at pp. 205-206), Manson argues that the Plaintiff accessed the MB1704 crane barge primarily via a gangway, and that a small "fleet boat" was only used when it was not feasible to use the gangway.[4]  (Givan Declaration, ¶ 23).

---

[4]     The Plaintiff testified that sometimes a gangway could not be used because piles were in the way.  (Bouton Depo., p. 206).

Plaintiff's description of his job duties during Phase II is different. Plaintiff argues that, once Phase II started, his job switched from being exclusively "land side" work to "water side" work. That is, from early March until he was injured in April, Plaintiff alleges that he worked aboard a group of vessels that were owned or leased by Manson and worked primarily on a "very large deck barge" with a crawler crane affixed to it. (*See* Plaintiff's Opposition Brief, [Doc. 39] at p. 1). Plaintiff argues that "[i]f he was not on that barge pulling piles out of the St. Johns River, then he was piloting a skiff going to and from, working off the skiff, maintaining the vessel, aboard the transport barge, sometimes piloting same, or on the derrick barge "Wotan.["][5]  (*Id.* at pp. 1-2]. The Plaintiff further alleges that:

> ... the barge that he worked upon each and every day was set up to pull the old piles out of the St. John's River, lay them down on a transport barge, at which time he would board the transport barge, and travel with that barge down river, where he helped the crew off-load the old piles, travel back up river and return to the work barge where the crane was pulling/removing the piles, and repeat ... on occasions he went up into the pilot house of the tug and drove the tug under the supervision of the captain. He also piloted the skiff to and from wherever it needed to be [] and worked off the skiff.

(*Id.* at pp. 2-3).

The Plaintiff also testified that he assisted in preparing the crane to remove the pilings from the water, requiring him to frequently go back and forth between the MB1704 crane barge to the material barge (Bouton Depo., pp. 201-203), and that he

---

[5]  Manson argues that, although it employed a derrick barge, the WOTAN, located near the BIMT Project, as well as the vessel the BILLY CENAC, which Manson chartered from Caillou Island Towing, Plaintiff was not a crewmember of either vessel. (Givan Declaration, ¶¶ 29-30).

also sometimes rode in a tugboat to change the positions of the barges.  (Bouton Depo., p. 202).  He further testified that when it was time to remove the pilings from the material barge, he would either ride in a company truck to the offloading site, or, on occasion, would ride in the tugboat that moved the material barge to the offloading site.  (*Id.* at pp. 196-197); (Givan Declaration, ¶ 24).

Both parties agree that the Plaintiff did not live or sleep on the MB1704.  After the completion of each day's work, Plaintiff left the BIMT Project jobsite and returned home before returning to the jobsite the next day by car.  (Givan Declaration, ¶¶ 24-25).  Plaintiff ceased working on the BIMT Project prior to the project's completion. (*Id.* at ¶ 26).  Regardless, after the completion of the task of demolition of the old BIMT dock on the BIMT Project, Manson avers that it intended to utilize skilled laborers to construct the new dock on the water side.  As such, had Plaintiff's employment with Manson continued through the completion of Phase II, Bouton would not have continued his work on the spudded down Manson barges.  (*Id.* at ¶¶ 27-28).

Plaintiff testifies to the following regarding the alleged injury:

Q:     And so what had happened, y'all had just – Before your accident happened, the crane operator had – had pulled one of the – the piles out of the water and – and he lowered it to the material barge?

A:     Yeah, he pulled it out, and then he would lay it down.

Q:     Okay.  All right.

…

Q:      So can you just walk me through the processes once they lay the piling down?  It has to be de-rigged?  Is that fair?

A:      Yes, sir.

Q:      And is that what y'all were in the process of doing, is de-rigging it?

A:      Yes, sir.

Q:      Okay.

        And explain to me, you know, this piling, when you laid it down, it is laid down flat on the deck of that material barge –

A:      No.  It's –

Q:      or is it laid on dunnage?[6]

A:      It's laid on dunnage, yeah.

Q:      Okay.

. . .

Q:      Tell – just walk me through the process of how it works when you de-rig a piling on the material barge.

A:      How it works?  They come.  You got your dunnage running like this, crossways across.  They come with the pile, lay it down like that on the dunnage.  (Indicating) The crane comes off of it some.  We go – Like I say, I was undoing the shackle.  I would turn around like this, set the pin down.  (Indicating).

Q:      Yeah.

A:      Would turn back around, grab the – grab the shackle, move it out the cable, and then Steve [Patterson] would pull the cable where it would come from underneath the pile –

---

[6]      Dunnage is wood that is placed in between cargo to separate and protect one cargo from another piece of cargo.  They are "spacers."  *Kirksey v. P & O Ports Texas, Inc.*, 488 F. Supp. 2d 579, 584 (S.D. Tex. 2007), *rev'd sub nom.*, *Kirksey v. Tonghai Mar.*, 535 F.3d 388 (5th Cir. 2008).

Q:     Yeah.

A:     -- where the crane could take it back up.

Q:     Okay.

…

Q:     And – And tell me based upon your impression this one time what
       happened an – and – and why that it caused it to land on your
       foot.

A:     Before I could turn around from putting the pin down, Steve
       yanked on the cable.

Q:     Okay.

       And so that caused what?

A:     That caused the shackle to fall off the top of the pile.

Q:     Okay.

       And typically, how would it work?  You know, why was it that one
       time that he pulled the cable too soon?

A:     I don't know.  I couldn't tell you that.

Q:     Okay.

       Is it typical that he would just do it visually watching you, or
       would y'all communicate, or how would it work normally?

A:     Well, yeah.  We was – He was – He would wait till I turn around
       and grab the shackle.

Q:     Okay.

       And in this case you hadn't grabbed the shackle?

A:     I hadn't turned around yet. –

Q:     Okay.

A.      – completely.

Q:     Okay.

        And – And the shackle, where was the – The shackle was located on top of the piling?

A:     It was on top of the – Yes, sir.

Q:     Okay.

        So then it would have fallen about two feet down to your toe?

A:     Yeah.

Q:     Okay.

[Bouton Depo. at pp. 118, 127-132.]

After his accident, Plaintiff sought and received benefits under the Longshore and Harbor Workers' Compensation Act ("LHWCA") in connection with his alleged foot injury.  Plaintiff received a total of $72,750.71 in LHWCA benefits until his treating physician, Dr. Christopher Hebert, declared plaintiff at maximum medical improvement on October 3, 2022.  (*See* Manson's Motion for Summary Judgment, [Doc. 37] at p. 7).

## PROCEDURAL HISTORY

Plaintiff filed the instant lawsuit on October 4, 2022, under the Jones Act, 46 U.S.C. § 30104, the general maritime law of the United States, and Louisiana state law.  He alleges federal jurisdiction over these claims pursuant to Article III, Sect. 2, cl. 3 of the United States Constitution, as well as 28 U.S.C. § 1333.  The Plaintiff designated his claims pursuant to Rule 9(h) of the Federal Rules of Civil Procedure, and the matter is set for a bench trial in this Court on March 4, 2024.

In the instant motion, Manson seeks dismissal of the Plaintiff's Jones Act claims on grounds he is not a Jones Act seaman.  The Plaintiff filed an Opposition [Doc. 39] on October 18, 2023, to which Manson filed a Reply [Doc. 42] on October 25, 2023.  Oral argument on the Motion was conducted on November 7, 2023.  (*See* Minutes, [Doc. 45]).  The Motion is now ripe for ruling.

LAW AND ANALYSIS

## I.   Summary Judgment Standard

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

The movant bears the burden of demonstrating the absence of a genuine dispute of material fact but need not negate every element of the nonmovant's claim. *Hongo v. Goodwin*, 781 F. App'x 357, 359 (5th Cir. 2019) (citing *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010)).  If the movant meets this burden, the

burden then shifts to the nonmovant who is required to "identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004). However, summary judgment cannot be defeated through "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 788 (5th Cir. 2017) (quoting *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002)).

In applying this standard, the Court should construe "all facts and inferences in favor of the nonmoving party." *Deshotel v. Wal-Mart Louisiana, L.L.C.*, 850 F.3d 742, 745 (5th Cir. 2017); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). The motion for summary judgment should be granted if the non-moving party cannot produce sufficient competent evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

## II.   Jones Act

"The Jones Act grants 'a seaman' a cause of action against his employer in negligence." *Sanchez v. Smart Fabricators of Tex., L.L.C.*, 997 F.3d 564, 568-69 (5th Cir. 2021) (quoting 46 U.S.C. § 30104). However, because the Jones Act does not define the term "seamen," courts have developed jurisprudential guideposts to assist in determining whether a particular employee holds "seaman status" under the Jones

Act.  *Sanchez*, 997 F.3d at 569.  To qualify as a "seaman," a maritime worker must satisfy a two-part test: he or she: (i) "must contribute to the function of the vessel or to the accomplishment of its mission," and (ii) "must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature."  *Johnson v. Cooper T. Smith Stevedoring Co., Inc.*, 74 F.4th 268, 273 (5th Cir. 2023), *citing In re Endeavor Marine Inc.*, 234 F.3d 287, 290 (5th Cir. 2000) (citing *Chandris Inc. v. Latsis*, 515 U.S. 347, 368, 115 S. Ct. 2172, 132 L.Ed.2d 314 (1995)).

The first part of this test, or the "threshold requirement" of whether a worker "do[es] the ship's work," is "very broad."  *In re Endeavor Marine Inc.*, 234 F.3d at 290.  Indeed, "[a]ll who work at sea in the service of a ship are *eligible* for seaman status."  *Chandris*, 515 U.S. at 368, 115 S. Ct. 2172 (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 354, 111 S. Ct. 807, 112 L.Ed.2d 866 (1991)) (emphasis in original).  Manson concedes that almost all maritime workers satisfy this test.  Thus, to the extent that the mission of the MB1704 was the removal of old pilings in preparation for the building of a new dock, the Court finds that the Plaintiff was a worker in the service of the MB1704.

The second part of the test – whether the worker has a substantial connection to a vessel – has two elements: the worker's connection must be "substantial in terms of both [1] its duration <u>and</u> [2] its nature."  *Sanchez*, 997 F.3d at 571 (quoting *Chandris*, 515 U.S. at 368, 115 S. Ct. 2172) (emphasis added).  For the duration element, the "rule of thumb for the ordinary case" is that "[a] worker who spends less

than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman." *Chandris*, 515 U.S. at 371, 115 S. Ct. 2172.  Declining to address the duration element, Manson argues that the Plaintiff is not a Jones Act seaman because he did not have an employment connection with a vessel in navigation that was substantial in nature.

In *Sanchez v. Smart Fabricators*, the plaintiff, a welder, worked on two different jack-up barges owned by his employer's customer.  997 F.3d at 566-67.  The plaintiff worked on the first barge for 48 days doing welding work on a discrete repair job.  *Id.* at 567.  The entire time the plaintiff worked on this vessel, it was jacked-up so that the deck of the barge was level with the dock and was separated from the dock by a gangplank.  *Id.*  It only took two steps on the gangplank for Sanchez to reach shore. *Id.*  The plaintiff commuted from his home to the vessel daily.  *Id.*  The plaintiff worked on the second barge for 13 days, during which time the latter barge was located on the outer continental shelf.  *Id.*  On the second barge, the plaintiff's work involved welding and other repairs necessary to get the vessel in condition to satisfy certain regulatory requirements prior to beginning drilling operations at a new drilling site on the outer continental shelf.  *Id.*  Sanchez was aboard the second barge when he was injured.  *Id.*

In *Sanchez*, the Fifth Circuit sitting *en banc* discussed the jurisprudential history of courts determining the "seaman status" of employees.  Summarizing this history in the context of offshore oil and gas exploration and production, the *Sanchez* court found:

Our case law reveals generally that two types of workers are found on drilling rigs. First, we have the drilling crew, who conduct the drilling operations (and workers who support that activity) and stay with the vessel when it moves from one drilling location to another. These workers are the members of the crew of the vessel and are seamen. The second group are specialized transient workers, usually employed by contractors. These workers are engaged to do specific discrete short-term jobs. Discrete transient jobs are like the work done by longshoremen when a vessel calls in port. As stated in *Papai*, these workers have only a "transitory or sporadic" connection to a vessel or group of vessels and do not qualify for seaman status. Sanchez, as a transitory worker, falls into the second group, and thus does not satisfy the nature test.

997 F.3d at 576 (internal citations omitted).

Seeking to provide further clarification, the *Sanchez* court directed district courts to consider four factors when deciding whether a worker's connection to a vessel is substantial in nature: (i) to whom does the worker owe his allegiance; (ii) is the work sea-based or involve sea-going activity; (iii) is the worker's assignment on the vessel discrete and when completed, does the connection to the vessel end or does the work include sailing with the vessel port to port or assignment to assignment; and (iv) does the work expose the worker to "perils of the sea?" 997 F.3d at 574. *See also Johnson*, 74 F.4th at 273. The Court will discuss each of these factors in turn.

### A. Whether Plaintiff Owed His Allegiance to a Vessel or to a Shoreside Employer

*Sanchez* does not define the term "allegiance" and provides little guidance as to how this factor should be applied or measured – instead merely quoting from *Chandris* that: "Congress established a clear distinction between land-based and sea-based maritime workers. The latter, who owe their allegiance to a vessel and not solely to a land-based employer, are seamen." *Sanchez*, 997 F.3d at 574, n. 65, *quoting*

Chandris, 515 U.S. at 359, 115 S. Ct. 2172.  In the instant case, the barges on which the Plaintiff worked were either owned or chartered by Manson, and there is no dispute that the barges were, in fact, vessels at the time the Plaintiff worked on them.

Manson argues that Plaintiff was a strictly land-based worker who owed his allegiance to Manson rather than any vessel and points out the following facts to support that argument: (i) the Plaintiff was hired as a general labor carpenter to perform shore-based tasks in connection with the demolition of the BIMT dock; (ii) although certain discrete tasks required the Plaintiff's presence on barges that were either spudded down or tied off next to the shore, the Plaintiff was not assigned to any vessel, and the majority of his work was land-based labor; and (iii) the Plaintiff's connection to the barges in question was only to last as long as the demolition of the dock lasted – after which, Manson intended to hire skilled workers to construct the new dock.  Bouton counters that, although he was initially hired as a carpenter on the "land side" of the BIMT Project, the nature of his job changed when he switched to the "water side" of the project.  And during this latter period of employment (when the injury occurred), Bouton urges that he was a vessel-based worker working on a group of vessels that were all owned or controlled by Manson.

In *Johnson v. Cooper T. Smith Stevedoring Co., Inc.*, 610 F. Supp. 3d 867, 871 (M.D. La. 2022), *aff'd*, 74 F.4th 268 (5th Cir. 2023), the plaintiff was employed by defendant CTS, a company that provided midstream cargo loading and unloading services to vessels traveling the Mississippi River.  Because of the nature of its work, CTS owned and operated a weigh station vessel, the AMERICA, which was used to

transfer bulk cargo from barges to oceangoing vessels midstream.  *Johnson*, 610 F.Supp.3d at 871.  Johnson was injured when he fell to the deck of the AMERICA from the deck of an adjacent cargo barge.  *Id.* at 872.

Johnson filed suit against CTS, alleging, *inter alia*, that he was a seaman and a member of the crew of the AMERICA.  *Id.* at 873.  The district court granted CTS's motion for summary judgment and dismissed Johnson's claims with prejudice, finding that CTS's unrebutted evidence showed: (i) the plaintiff owed his allegiance to CTS and not to any particular vessel; (ii) the plaintiff's employment with CTS did not require sailing or sea-going activity; and (iii) the plaintiff's work aboard any particular vessel was limited to performing discrete stevedoring services, after which plaintiff's connection to the vessel would end.  *Id.* at 875, *citing Sanchez*, 997 F.3d at 574.  On appeal, the Fifth Circuit affirmed the district court's conclusion that Johnson failed to satisfy the "substantial in nature" element and focused its discussion on the plaintiff's lack of a substantial connection to a vessel in terms of duration.  *Johnson v. Cooper T. Smith Stevedoring Co., Inc.*, 74 F.4th 268, 271 (5th Cir. 2023).

Similarly, in the instant case, the Plaintiff worked as a carpenter on a per-day basis, arriving at the job site each morning by vehicle and leaving the job site each evening in the same manner.  The Plaintiff was not assigned as a crew member to either the MB1704 or the material barge, and he was hired specifically and solely to assist in the demolition of an existing dock at the Blount Island Marine Terminal, located approximately 20-30 feet from the shore.  This work did not require the Plaintiff to "sail" aboard any vessel.  Although the Plaintiff occasionally rode on a

small fleet boat in order to access the MB1704 when the gangway could not be used, and although he occasionally boarded a tugboat to move the position of the barges or to move the material barge downriver to unload the pilings, these tasks were part and parcel with the Plaintiff's discrete job responsibilities in assisting with the demolition of the old dock.  The Plaintiff was not assigned to either the fleet boat or the tugboat, he did not eat or sleep on either of these vessels or the MB1704, and his job was solely focused on the removal of old pilings so that a new dock could be built. Under these circumstances, the Court concludes that the Plaintiff owed his allegiance to Manson and not to any vessel or fleet of vessels owned or controlled by Manson.

### B.   Whether Plaintiff's Work Was Sea-Based or Involved Seagoing Activity

The Plaintiff's work was decidedly not sea-based.  The barges on which the Plaintiff worked were spudded down or tied off for the duration of the work.   In *Sanchez*, the plaintiff worked on a jack-up barge for 48 days doing welding work on a discrete repair job.  997 F.3d at 567.  The *Sanchez* court noted that the entire time the plaintiff worked on this vessel, it was jacked-up so that the deck of the barge was level with the nearby dock and was separated from the dock by a gangplank.  Sanchez could take two steps on the gangplank, and he was ashore, and he commuted from his home to the vessel daily.  *Id.*  The Fifth Circuit concluded that these facts strongly supported the conclusion that Sanchez was a land-based worker.  *Id.* at 575.

In *Matter of Ingram Barge Co., L.L.C.*, 2023 WL 6123107, at *6 (5th Cir. Sept. 19, 2023) (unpublished), the plaintiff worked as a barge cleaner for T.T. Barge Services ("T.T."), which provides barge cleaning services to Ingram Barge Company

("Ingram"). The plaintiff asserted negligence claims against T.T. and Ingram after he was injured by caustic soda that he was cleaning up on an Ingram barge. The Ingram barge was moored to one of T.T.'s work barges at the time of the injury. *Ingram*, 2023 WL 6123107, at *1. T.T. moved for summary judgment as to the plaintiff's lack of seaman status, and the district court granted T.T.'s motion. *Id.* at *2. On appeal, the plaintiff stressed that: (i) Ingram's barges were directly in the Mississippi River and at risk of collision with mid-river watercraft that had previously struck T.T.'s cleaning barge; and (ii) he had previously ridden Ingram's barges about 200 feet between T.T.'s repair barge and cleaning barge, despite T.T. company policy against such rides. *Id.* at *6. T.T. denied any such rides and argued that if the plaintiff rode on Ingram's barges, these rides were not only a violation of T.T. company policy, but also were taken by plaintiff as a mere passenger to avoid walking on land from one tier of the facility to another. *Id.* Ingram argued the plaintiff's work could not be seagoing because the plaintiff had admitted both that: (i) Ingram's barges were always moored during the plaintiff's cleaning duties, including during the time of the accident; and (ii) the plaintiff had no duties with respect to any moving barges or vessels. *Id.*

The Fifth Circuit, affirming the decision of the district court that the plaintiff was not a seaman, agreed that the plaintiff's work responsibilities were not sea-based, explaining:

> Here, Ingram's arguments show that [plaintiff's] barge cleaning work was not sea-based and did not involve seagoing activity. And [plaintiff's] arguments can be distinguished. That a T.T. work barge was once struck does not make [plaintiff's] cleaning work aboard nearby Ingram

> barges any more "seagoing" than an object can become "seagoing" just
> because a nearby dry dock has been struck.  And [plaintiff] only claims
> that he slept at T.T.'s facility, not aboard Ingram's barges.  Only the
> alleged 200-foot customer barge rides against company policy suggest
> any sea-based work or seagoing activity—and those hardly subject
> [plaintiff] to the perils of the sea.  Even viewing that fact in the light
> most favorable to [plaintiff] at summary judgment, the second Sanchez
> factor is neutral at best and cannot help [plaintiff] satisfy Chandris's
> substantial connection requirement.

*Id.* at *6.  *See also, Bonmarito v. Belle Chasse Marine Transportation*, 591 F.Supp.3d

115 (E.D. La. 2022) (where defendants provided solid evidence that the plaintiff

worked mostly on land and that when his work took him onto the vessel, the vessel

was secured to the dock, the court found it "doubtful" that the plaintiff's work was

sea-based).

Similarly, here the Plaintiff's work on the MB1704 and the material barge was

performed while those barges were spudded down or tied off and were situated close

to shore.  Further, Plaintiff's own testimony regarding the nature of his work onboard

MB1704 and the material barge shows that his duties were limited to a few discrete

tasks – the Plaintiff assisted the crane on MB1704 in picking up the pilings, stepped

over to the material barge, removed the pilings from the crane's hook, and then went

back to the MB1704 to assist in gathering the next pilings.  This work would have

continued until all pilings had been pulled up and Manson was ready to begin

construction of the new dock.  The Plaintiff performed this work while MB1704 was

spudded down and while the material barge receiving the pilings was either spudded

down or tied off.  None of the work performed by the Plaintiff was of a "seagoing

nature" or subjected Bouton to the "perils of the sea."  The Plaintiff's duties did not

"take him to sea;" his work on the docked barges was not "of a seagoing nature;" and after he finished his work at the dock, "he was not going to sail" with any vessel.  For these reasons, the Court finds that the Plaintiff's work was not sea-based.

> ### C.   Whether Plaintiff's Assignment to a Vessel was Limited to Performance of a Discrete Task After Which His Connection to the Vessel Ended, or Whether He Stayed with the Vessel

It is undisputed that the Plaintiff stopped working on the BIMT Project after he was injured during Phase II of the project.  It is also uncontroverted that once the removal of the finite number of pilings was complete, Manson would not have begun the construction of a new dock for which skilled labor was required, and the Plaintiff would not have continued his work on the MB1704 spud barge or the material barge. (Givan Declaration, § 28).  This factor strongly suggests that the Plaintiff was a land-based worker.

Considering the foregoing and based on the summary judgment evidence viewed in the light most favorable to Plaintiff, the Court concludes that application of the *Sanchez* factors precludes finding a "substantial connection" between Bouton and Manson's vessels.

## III.   Plaintiff's Remaining Claims

In addition to his claims under the Jones Act, Plaintiff also asserts claims under the general maritime law and the laws of the State of Louisiana.  Although Manson does not address these claims in the instant Motion, they are also subject to dismissal, as the only remedy available to the Plaintiff lies exclusively within the

Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901–950.

Section 905(a) of the LHWCA provides that "[t]he liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee." 33 U.S.C. § 905(a).[7]   In *Norfolk Shipbuilding & Drydock Corp. v. Garris*, the Supreme Court held:

> [T]he [LHWCA] provides nonseaman maritime workers ... with no-fault workers' compensation claims (against their employer, § 904(b)) and [vessel] negligence claims (against the vessel, § 905(b)) for injury and death. As to those two defendants, the LHWCA expressly pre-empts all other claims, §§ 905(a), (b), but it expressly preserves all claims against third parties, §§ 933(a), (i).

532 U.S. 811, 818, 121 S. Ct. 1927, 150 L.Ed.2d 34 (2001) (citation omitted), *cited in McLaurin v. Noble Drilling (US) Inc.*, 529 F.3d 285, 287 (5th Cir. 2008).

The record shows that the Plaintiff sought and received benefits according to the LHWCA in connection with his alleged foot injury.  Plaintiff received a total of $72,750.71 in LHWCA benefits until his treating physician, Dr. Christopher Hebert,

---

[7]     Section 904 provides:

> (a) Every employer shall be liable for and shall secure the payment to his employees of the compensation payable under sections 907, 908, and 909 of this title.  In the case of an employer who is a subcontractor, only if such subcontractor fails to secure the payment of compensation shall the contractor be liable for and be required to secure the payment of compensation. A subcontractor shall not be deemed to have failed to secure the payment of compensation if the contractor has provided insurance for such compensation for the benefit of the subcontractor.
>
> (b) Compensation shall be payable irrespective of fault as a cause for the injury.

33 U.S.C. § 904 (West).

declared plaintiff at maximum medical improvement on October 3, 2022. (*See* Manson's Motion for Summary Judgment, [Doc. 37] at p. 7). Because the Plaintiff is a non-seaman maritime worker, and because Manson is the Plaintiff's employer, the LHWCA's remedy is exclusive. Accordingly, the Plaintiff's claims under the general maritime law and Louisiana state law will be dismissed.

Typically, a district court may grant summary judgment only on grounds requested by the moving party. *Molina v. Home Depot USA, Inc.*, 20 F.4th 166, 169 (5th Cir. 2021), *citing John Deere Co. v. Am. Nat'l Bank*, 809 F.2d 1190, 1192 (5th Cir. 1987). A district court should not grant summary judgment on a claim *sua sponte* without giving the parties ten days' notice. *Molina*, 20 F.4th at 169, *citing Lozano v. Ocwen Fed. Bank, FSB*, 489 F.3d 636, 641 (5th Cir. 2007). Accordingly, the Court will allow Plaintiff ten (10) days from this Order to urge the Court to re-consider dismissal of his "claims under the general maritime law and the laws of the State of Louisiana."

## CONCLUSION

For the reasons stated herein, this Court concludes that there is no genuine dispute of fact demonstrating a substantial connection between the Plaintiff and a vessel or group of vessels. Consequently, the Plaintiff is not a Jones Act seaman, and Defendant Manson Construction Co. is entitled to summary judgment as a matter of law on Plaintiff's claims alleged under the Jones Act. The Court further finds that the Plaintiff's claims under general maritime and Louisiana law are precluded by 33 U.S.C. § 905(a).

Accordingly,

IT IS HEREBY ORDERED that Manson Construction Co.'s MOTION FOR SUMMARY JUDGMENT [Doc. 37] is GRANTED, and Plaintiffs' claims under the Jones Act, general maritime law, and Louisiana law are DENIED AND DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Plaintiff may urge the Court to reconsider its dismissal of his claims under the general maritime law and the laws of the State of Louisiana within ten (10) days of this Order.

THUS, DONE AND SIGNED in Chambers on this 7th day of December 2023.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE